UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

OMARI GRAHAM,

        Defendant.

REPORT & RECOMMENDATION

08-CR-6259L

---

**PRELIMINARY STATEMENT**

By Order of Hon. David G. Larimer, United States District Judge, dated October 21, 2009, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 27).

Defendant Omari Graham ("Graham") is charged in a three-count indictment in connection with events that occurred on October 17, 2008. The first count charges Graham with unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The second count of the indictment charges Graham with possession of a controlled substance, in violation of 21 U.S.C. § 844(a). The final count contains forfeiture allegations pursuant to 18 U.S.C. §§ 924(d) and 3665 and 28 U.S.C. § 2461(c). (Docket # 1).

Currently before this Court are Graham's motions to suppress certain physical evidence seized from his person and from the vehicle in which he was a passenger on October

17, 2008, and statements he made to police following his arrest that night. (Docket ## 5, 13).[1]
The government opposes both motions. (Docket ## 6, 15).

On June 26, 2009, this Court conducted an evidentiary hearing on Graham's suppression motions. The government called as witnesses Sergeant Thomas Rowe and Deputies Gregory Wildman and John Auberger of the Monroe County Sheriff's Office. No witnesses testified for the defense. Graham and the government thereafter submitted supplemental memoranda. (Docket ## 25, 26).

The following constitutes this Court's recommendation with respect to Graham's motions.

## FACTUAL BACKGROUND

### I. Testimony of Deputy Wildman

Gregory S. Wildman ("Wildman") is employed as a deputy sheriff with the Monroe County Sheriff's Office. (Tr. 6).[2] On October 16, 2008, Wildman was assigned to patrol duty on the county's westside. (Tr. 6-7, 41). Prior to beginning his patrol shift that night, Wildman attended routine roll call at 9:45 p.m., during which officers working that shift were apprised of recent crime trends and other relevant information.[3] (Tr. 9-10). Based upon the

---

[1] Graham's omnibus motion also sought, *inter alia*, a bill of particulars, *Brady* material, discovery and inspection, *Jencks* material, preservation of rough notes and rulings on evidentiary matters under Rules 404 and 609 of the Federal Rules of Evidence. (Docket ## 5, 13). Each of these requests was either resolved by the parties or decided in open court by the undersigned on June 3, 2009. (Docket # 16).

[2] The transcript of the suppression hearing conducted before this Court on June 26, 2009, shall hereinafter be referenced as "Tr. __." (Docket # 30).

[3] Wildman attended roll call in the "B Zone," although his patrol shift that night was in the "C Zone." (Tr. 9, 74-75).

2

information disseminated at roll call, as well as recent police bulletins with which Wildman was familiar, Wildman knew that several armed robberies had been committed recently throughout the county, including one at a Hess gas station in Gates, New York. The suspects were described only as two black males and the automobile that they drove was identified as an early 1990s model, four-door white Honda. (Tr. 9, 10-11, 14, 34).

Not long after he began his patrol on October 16, at approximately 10:30 p.m., Wildman observed a white four-door Honda in front of him at the intersection of Chili Center Coldwater Road and Chestnut Ridge Road. (Tr. 8, 11-12). He entered the vehicle's license plate number into his mobile data terminal and followed the car until it pulled into a Mobil gas station at the corner of Chili Avenue and Chili Center Coldwater Road. (Tr. 12-13, 35-36). Wildman could see that the car had two occupants, but he could not discern their gender or race. (Tr. 13, 35). He also called the City of Rochester's records department to determine whether the license was associated with any reported criminal activity. (Tr. 14, 36-37).

Shortly thereafter, Wildman was dispatched to an unrelated motor vehicle accident. (Tr. 12-14). On the way, Wildman drove past the Mobil station where he had last seen the white Honda and observed that it was no longer there. (Tr. 14).

After concluding his work at the motor vehicle accident, Wildman met Deputy Auberger for coffee and reviewed the information regarding the Honda that was connected to the spate of recent robberies. (Tr. 14, 38-40). He also learned from the City's records department that the license plate on the Honda that he had observed was not associated with any reported criminal conduct. (Tr. 14, 37).

3

After resuming his patrol duties, he again observed the white Honda that he had followed earlier. This time he observed it at approximately 2:00 a.m. on Chili Avenue. (Tr. 15). At the time he saw it, Wildman was parked in the parking lot of a fire station located on Chili Avenue in Chili, New York. Aided by the lights surrounding the fire station, he was able to read the front license plate of the Honda as it approached him. (Tr. 16, 43). Wildman further testified that as the Honda passed him, he observed that the rear license plate was not illuminated, in violation of the New York State Vehicle and Traffic Law. (Tr. 15-16, 30, 43-44).

At that point, Wildman activated his emergency lights and followed the Honda. The Honda pulled over at the corner of Chili Avenue and Bright Oaks Drive. (Tr. 18-19, 44). After entering data into his mobile data tracking device, Wildman got out of his patrol car and approached the driver's side of the Honda. (Tr. 19-20, 44). Wildman asked the driver for her license and registration; the driver replied that she did not have her license with her. (Tr. 20, 44-45). Wildman then turned to the passenger – the defendant – and requested his identification; Graham provided his New York State driver's license to Wildman. (Tr. 20-21, 46). Graham also attempted to locate the car's registration in the glove box, but Wildman could not recall whether the registration was produced. (Tr. 45-46).

Wildman testified that he told Graham to stay in the vehicle and escorted the driver to his patrol car. (Tr. 20, 46). According to Wildman, the driver, who was later identified as Didra Smith ("Smith"), initially identified herself by the name of an individual who had a valid license.[4] (Tr. 21). In response to further questioning by Wildman, Smith stated that she did

---

[4] Later that evening, Smith admitted to Wildman that she had lied about her identity by giving him her sister's name. (Tr. 29). She was eventually arrested for criminal impersonation. (*Id*.).

4

not know Graham well, that he was planning to drive her to a hospital after she had fallen down a set of stairs earlier in the night, but that they had gone to a bar instead. (Tr. 22). According to Wildman, Smith could not explain their curious change in plans or the fact that she, rather than Graham, was driving the Honda. (Tr. 22).

During the traffic stop, Wildman also ran a check on Graham's driver's license and discovered that Graham was on federal supervised release and that his license had been suspended. (Tr. 22, 27, 48). Wildman stated that as a result of that information, the inability of the driver to provide identification, and the similarity between the Honda and the description of the vehicle involved in the recent robberies, he attempted to contact Deputy Auberger to request assistance during the stop.[5] (Tr. 50).

After about six or seven minutes, Wildman observed Graham exit the passenger side of the Honda, talking on his cell phone. (Tr. 22, 46-47). Wildman directed Graham to get back into the Honda. (Tr. 22-23, 47). Graham replied that he needed to call someone to move the Honda and continued to pace by the passenger side of the car. (Tr. 23, 48). Wildman again directed Graham to return to the car. (Tr. 23, 47). After Graham failed to comply, Wildman unsnapped his holster, put his hand on his pistol and yelled at Graham to get back into the car. (Tr. 23, 47). This time Graham obeyed. (Tr. 23, 24, 48).

Wildman returned to his vehicle and requested back up. (Tr. 24, 50-51). Sergeant Rowe ("Rowe") and Deputy Auberger responded to Wildman's request for assistance. (Tr. 24-25). Rowe arrived first, about two minutes after Wildman's request. (Tr. 25). Shortly after

---

[5] Deputy Auberger was evidently not in his vehicle at that time and did not receive Wildman's message. (Tr. 48-49).

5

Rowe arrived, Wildman heard the Honda's engine ignite and the tires squeal, and he observed Graham driving away at a high rate of speed. (Tr. 25-26, 51).

Rowe pursued the Honda until it crashed into a utility pole. (Tr. 26-27). Wildman could not participate in the chase because he had a passenger (the Honda's driver) in his patrol car. (Tr. 26). He eventually arrived at the crash scene, where he observed officers escorting Graham to a police vehicle a few minutes later. Wildman identified Graham as the passenger whom he had encountered at the traffic stop (Tr. 28) and issued him tickets for various violations of New York's Vehicle and Traffic Law, including reckless driving and aggravated unlicensed operation of a vehicle in the third degree, both misdemeanors, and leaving the scene of a property damage accident (Tr. 30-32).

## II. Testimony of Sergeant Rowe

At the time of the suppression hearing, Rowe had been employed for two and one-half years as a sergeant with the Monroe County Sheriff's Office. (Tr. 54). On October 16, 2008, he conducted the roll call for the patrol shift to which Wildman was assigned that evening ("C Zone").[6] During roll call, Rowe reviewed a law enforcement bulletin concerning a white Honda Accord that was believed to have been used by the suspects in several robberies in Monroe County, including a robbery that occurred in the Town of Gates. (Tr. 57-58, 75-76). The bulletin also contained photographs of one of the suspects in the Gates robbery and the white Honda. (Tr. 58, 75-78).

---

[6] See Footnote 3 *supra*.

Rowe testified that at approximately 2:30 a.m. on the morning of October 17, 2008, he responded to a request from Deputy Wildman for assistance at a traffic stop. (Tr. 54-55, 78). Rowe arrived at the stop less than one minute later and observed that Wildman had pulled over a white Honda. (Tr. 55-56). Rowe testified that the distance between Gates, where one of the previous robberies had been committed, and the location where Wildman had pulled over the white Honda is less than three-quarters of a mile. (Tr. 60). When he arrived, Rowe observed that one individual was seated in the Honda, and another was seated in Wildman's patrol car. (Tr. 56). Shortly thereafter, Wildman advised him that the individual in the white Honda was acting a "little hinkey" and "nervous" and did not want to remain inside the Honda. (Tr. 56, 79-80). Less than a minute later, he observed the passenger in the white Honda jump over the center console into the driver's seat and take off at a high rate of speed. (Tr. 57, 80).

Rowe pursued the Honda westbound on Chili Avenue toward Chili Center Coldwater Road. (Tr. 61, 80). As he chased the Honda, Rowe heard Wildman broadcast over the radio that the vehicle and its driver were possibly wanted in connection with several robberies and that the driver was currently on federal supervised release. (Tr. 64). According to Rowe, the Honda was no more than approximately one-tenth of a mile ahead of him during the chase and was traveling at more than one hundred miles an hour.[7] (Tr. 61, 63). Rowe continued to pursue the vehicle as it turned north from Chili Avenue onto Chili Center Coldwater Road. (Tr. 61-62, 67, 80). As the driver of the Honda attempted to turn from Chili Center Coldwater Road onto Chestnut Ridge Road, he lost control of the car and crashed into a utility pole on the northeast corner of Chili Center Coldwater Road and Chestnut Ridge Road. (Tr. 63-64, 67, 80-81, 84).

---

[7] Rowe testified that the fastest posted speed limit on Chili Avenue is forty miles an hour. (Tr. 63).

Rowe further testified that except for Deputy Auberger's patrol vehicle, he did not see any vehicles other than the Honda during the pursuit. (Tr. 65, 68).

After the Honda crashed, Rowe observed a black male in a dark hooded sweatshirt and dark colored jeans exit the vehicle and run behind a house located on the corner of Chili Center Coldwater Road and Chestnut Ridge Road. (Tr. 64, 69, 81). Rowe stayed on the scene to establish a perimeter and radioed that the driver had fled. (Tr. 64-65, 66). Rowe testified that he did not observe any other pedestrians in the area. (Tr. 66, 83).

Auberger then arrived on the scene, got out of his patrol car and pursued the individual on foot. (Tr. 71). Rowe heard Auberger call out that he had seen a male in a dark "hoodie" cross Tarrytown Drive heading east and then heard him shout to someone, "you're under arrest." (Tr. 71-72). About five minutes after the crash, Rowe observed the individual he had seen flee from the Honda lying face down in the backyard of 2 Tarrytown Drive; Auberger was holding him to prevent him from fleeing. (Tr. 70, 72-74, 82). At the hearing, Rowe identified the suspect as Graham. (Tr. 73).

Rowe assisted Auberger in lifting Graham to his feet so that Auberger could pat-frisk him. (Tr. 73, 83). During the pat-down, Graham exclaimed, "my life is over." (Tr. 73). According to Rowe, Graham was not being questioned when he made that statement. (*Id.*).

III. **Testimony of Deputy Auberger**

John Auberger ("Auberger") testified that on October 17, 2008, he was working as a deputy sheriff with the Monroe County Sheriff's Office. (Tr. 85, 97). During the early morning hours of his patrol shift that day, he and Deputy Wildman met for coffee, and Wildman

8

informed him that he had seen a white Honda matching the description of a vehicle involved in several local robberies. (Tr. 87, 97-98).

Auberger testified that later during the shift, Wildman contacted him to request his assistance with a traffic stop. (Tr. 87-88, 99-100). As Auberger drove to the stop, he heard Rowe radio that the Honda had fled the traffic stop and had crashed at the corner of Chili Center Coldwater Road and Chestnut Ridge Road. (Tr. 88-89, 100). Auberger also heard Rowe state that the driver of the Honda was a black male who was wearing a dark hooded sweatshirt and dark jeans and that he had fled the accident and was running eastbound. (Tr. 89).

After hearing these transmissions, Auberger turned east from Chili Center Coldwater Road onto Chestnut Ridge Road and saw a black male with dark clothing running eastbound across Tarrytown Drive. (Tr. 89-90, 101). As he turned onto Tarrytown Drive, he observed that the male was in between the first two houses on the east side of Tarrytown Drive. (Tr. 91). As Auberger exited his vehicle, he heard the "jingle" of a fence. (Tr. 90-92, 101-102). He jumped over a chain link fence at 2 Tarrytown Drive and immediately encountered a male lying on the ground in the backyard on his stomach. (Tr. 90-91, 92, 102). Auberger testified that he had only lost sight of the individual for fewer than ten seconds between the time that he first observed him and the time that he found him on the ground. (Tr. 92).

Auberger immediately arrested and handcuffed the individual, whom he later identified as Graham. (Tr. 86, 93, 102). According to Auberger, after Graham was handcuffed, Graham tried to get up and stated without prompting that his life was over. (Tr. 93, 103). Auberger then searched Graham and found a bag of marijuana and a ski mask in his back pocket. (Tr. 94, 102-103). Auberger testified that he immediately confiscated the marijuana, but did not

9

seize the ski mask until he observed Graham try to remove it as he led Graham to the patrol car. (Tr. 94-95, 104).

## DISCUSSION

Graham seeks to suppress the marijuana and ski mask seized from him at the time of his arrest, as well as his statement, "my life is over." (Docket ## 5, 13). He also moves to suppress two baseball caps seized from the Honda pursuant to a search warrant issued following Graham's arrest.[8] (Tr. 3; Docket # 25 at 14 n.16).

Graham argues that the initial traffic stop violated his Fourth Amendment rights and that his statement and all of the evidence seized following the stop must be suppressed as fruit of the illegal stop. (Docket # 26; Tr. 3-4). The government opposes the motion on the grounds that Wildman's traffic stop was justified and that Graham's subsequent arrest was supported by probable cause. (Docket # 25).

### I. Applicability of the Fruit of the Poisonous Tree Doctrine

The Fourth Amendment's exclusionary rule provides for the suppression at trial of evidence obtained in violation of a defendant's constitutional rights. The rule is designed to deter police misconduct and safeguard the integrity of the judicial process, *Wong Sun v. United States*, 371 U.S. 471 (1963), by putting the government "in the same position it would occupy had the police misconduct not occurred." *United States v. Clark*, 822 F. Supp. 990, 1006

---

[8] Because Graham challenges the seizure of the baseball caps solely on the basis of the fruit of the poisonous tree doctrine, no testimony regarding the search of the Honda was offered at the hearing. (Tr. 3-4; Docket # 25 at 14 n.16).

(W.D.N.Y. 1993) (citing *Nix v. Williams*, 467 U.S. 431, 443 (1984)). As an extension of the exclusionary rule, the court also must suppress all "fruit of the poisonous tree," that is, evidence acquired directly or indirectly as the result of an illegal search or arrest. *See Wong Sun v. United States*, 371 U.S. at 484. "[E]vidence seized during an unlawful search [cannot] constitute proof against the victim of the search. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Id.* (citations omitted).

An intervening act of the defendant's free will, however, may break the causal chain between the illegal police conduct and the allegedly tainted evidence. *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) (quoting *Wong Sun*, 371 U.S. at 486). *See also United States v. Alvarez-Porras*, 643 F.2d 54, 59 (2d Cir.) ("the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon that evidence by the original illegality") (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)), *cert. denied*, 454 U.S. 839 (1981). In other words, a "'but for' connection between the unlawful police conduct and the defendant's response" does not necessarily justify application of the fruit of the poisonous tree doctrine. *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982), *cert. denied,* 461 U.S. 933 (1983). *See also Wong Sun*, 371 U.S. at 487-88 ("[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police"). Rather, the question is "whether, granting establishment of the primary illegality, the evidence [challenged] has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (internal quotation omitted).

11

Where a defendant reacts to an unlawful stop by committing new crimes, that criminal conduct may purge the taint from any evidence subsequently seized. *See, e.g.*, *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (defendant's new crime of shooting at officer "purged the taint of the prior illegal stop"); *United States v. Bailey*, 691 F.2d at 1016-17 ("notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime"); *United States v. Bellamy*, 592 F. Supp. 2d 308, 321-22 (E.D.N.Y. 2009) (collecting cases; defendant's escape after "shouldering" and struggling with officers "purged any subsequently discovered evidence of the taint from the unlawful stop"); *United States v. Chin*, 859 F. Supp. 48, 51 (E.D.N.Y. 1994) ("[t]he defendant's flight, and subsequent violations of the law were not foreseeable and constituted intervening acts free of the initial taint associated with the stopping of his vehicle"). *See also United States v. Remington*, 208 F.2d 567, 570 (2d Cir. 1953) (it would be "an unwarranted extension of [the fruit of the poisonous tree] doctrine to apply it . . . to a new wrong committed by the defendant"), *cert. denied*, 347 U.S. 913 (1954). This rule is rooted in the recognition that "[a]llowing a defendant who responds to an unconstitutional stop with an illegal act to benefit from the exclusionary rule would immunize that defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *United States v. Bellamy*, 592 F. Supp. 2d at 322 (citing *Bailey*, 691 F.2d at 1017).

Here, Graham's flight from the traffic stop less than ten minutes after being pulled over gives rise to a causal connection between the stop and his subsequent flight. In fleeing, however, Graham committed several new traffic violations, such as speeding, driving with a

suspended license, reckless driving and fleeing the scene of a property damage site. Graham's decision to flee the traffic stop in a dangerous and reckless manner, disregarding various traffic laws in the process, was an act of his own free will. That volitional act purged the taint of any illegality of the initial stop. *Cf. United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir.) (defendant's acts of attempted escape at 115 miles per hour and shooting at an officer rendered "academic whether [defendant's] original arrest was lawful or not"), *cert. denied*, 404 U.S. 945 (1971). Thus, even if the initial stop had been illegal, Graham's commission of other criminal acts in response thereto prevent him from invoking the fruit of the poisonous tree doctrine to exclude evidence seized or statements made following the traffic stop. For this reason, the Court need not reach the question whether the initial traffic stop was constitutional.[9]

---

[9] In any event, the traffic stop was plainly constitutional on the basis of Wildman's credible observation that the Honda's rear license plate lamp was not illuminated, in violation of New York State Vehicle and Traffic law. *See*, *e.g.*, *Whren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1998) (vehicle's failure to signal lane change justified traffic stop); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.) ("[w]hen an officer observes a traffic offense – however minor – he has probable cause to stop the driver of the vehicle") (internal quotation omitted), *cert. denied*, 513 U.S. 877 (1994); *United States v. Harrison*, 2008 WL 2626829, *3 (N.D.N.Y. 2008) (traffic stop based on "non-functioning license plate light[] was lawful"). Although Wildman did not notice the absence of the rear light when he first observed the Honda, he explained that at the time he was behind the Honda and the headlights from his patrol vehicle illuminated the rear license plate, making it impossible for him to see whether the rear license plate lamp was working. (Tr. 43). It was not until the Honda drove past him the second time that he observed the Honda did not have a functioning rear license plate light. (Tr. 43-44).

Graham argues that even if the initial traffic stop were constitutional, his seizure was unconstitutionally "extended in order to accommodate an entirely unrelated investigatory inquiry" and that the "force used to detain him[] [was] not reasonably related to the scope of his initial stop." (Docket # 26 at 6). I find both of these arguments unpersuasive. First, Graham has made no showing that Wildman used unreasonable force to detain him. Rather, the hearing testimony established that Wildman did not physically detain Graham or detain him at gunpoint, but that Wildman unsnapped his holster and placed his hand on his firearm without withdrawing it because Graham had gotten out of the car, was pacing beside it and ignored Wildman's orders to get back into the Honda. (Tr. 23, 47).

Neither did Wildman's choice to question the driver about her activities earlier that evening unreasonably expand the scope of the traffic stop. "Pursuant to a valid traffic stop, the police may make inquiries that are reasonably related to the purpose of the stop," such as "requesting a driver's license and registration, and the destination and purpose of the trip." *United States v. Sparks*, 2004 WL 307304, *5 (S.D.N.Y. 2004) (citing *United*

13

The baseball caps were seized from the Honda following Graham's arrest and pursuant to the execution of a search warrant, the validity of which Graham has not challenged. (Tr. 3-4). Accordingly, no further inquiry is required with respect to the search warrant, and I recommend denial of Graham's motion to suppress the baseball caps. Likewise, Graham did not make his statement, "my life is over," until after he was arrested, and his only challenge to the arrest rests upon Fourth Amendment grounds. Therefore, I need not reach whether his Fifth Amendment right against self-incrimination was violated, and I recommend that Graham's motion to suppress the statement be denied as well.

Graham's motion to suppress the marijuana and the ski mask requires further analysis, however, because that evidence was seized during a search incident to Graham's arrest. Thus, I turn next to the question whether Graham's arrest was supported by probable cause.

## II. Probable Cause Existed To Arrest Graham

Probable cause to arrest arises when "the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983); *see also*

---

*States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir.), *amended by*, 279 F.3d 1062 (2001)), *aff'd*, 287 F. App'x 913 (2d Cir. 2008); *United States v. Harrison*, 2008 WL 2626829 at *4 (officer's questions regarding occupants' travels during traffic stop for non-functioning license plate light were reasonably related to the purpose of the stop). *See also United States v. Sparks*, 2004 WL 307304 at *5 (inquiries during a traffic stop "can include requesting a driver's license and registration, and the destination and purpose of the trip"). In addition, according to Wildman's testimony, approximately ten minutes passed from the time the Honda pulled over and the time that Graham fled. On this record, I find that the stop was appropriately limited in time and scope. *See*, *e.g.*, *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) (thirty-minute stop did not ripen into *de facto* arrest); *Harrison*, 2008 WL 2626829 at *6 (a less-than-five-minute stop was sufficiently limited).

*United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). The probable cause standard requires a "reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (*quoting Brinegar v. United States*, 338 U.S. at 175). *See United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (probable cause amounts to a "probability or substantial chance of criminal activity") (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)), *cert. denied*, 499 U.S. 924 (1991).

Here, I easily conclude that ample probable cause existed to arrest Graham when Auberger found him lying in the backyard of 2 Tarrytown Drive. By then, he had fled the scene of a traffic stop while driving with a suspended license, led the police on a high speed chase, crashed into a utility pole and fled on foot. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[h]eadlong flight . . . is the consummate act of evasion"). Each of the traffic infractions itself provides an adequate basis for Graham's arrest. *See Arkansas v. Sullivan*, 532 U.S. 769, 771 (2001) (upholding an arrest for speeding, "a fine-only traffic violation").

Having found that Graham's arrest was lawful, I also find that the seizure of the marijuana and the ski mask were justified. Upon a lawful arrest, the arresting officer may search the arrestee for weapons or for evidence of the suspected crime. *United States v. Robinson*, 414 U.S. 218, 225-26 (1973); *Chimel v. California*, 395 U.S. 752, 762-63 (1969). Here, Graham was searched immediately upon his arrest and the seizure of the marijuana and the ski mask as evidence was proper. Although Auberger did not initially seize the ski mask, his decision to do so moments later was justified when he observed Graham attempting to discard it. *United States v. Edwards*, 415 U.S. 800, 803 (1974) ("seizures that could be made on the spot at the time of arrest may legally be conducted later"). *See also Chimel v. California*, 395 U.S. at 763 ("it is

entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction"). Graham's possession of a ski mask in October, his apparent effort to discard it and his connection to a car that matched the description of the car used in recent robberies gave rise to probable cause that the mask had evidentiary value. *See United States v. Edwards*, 415 U.S. at 806 (police were entitled to seize articles of clothing as evidence of criminal conduct). I therefore recommend denial of Graham's motion to suppress the marijuana and ski mask seized from him at the time of his arrest.

### III. *Daubert* Hearing

Oral argument shall be heard on **December 8, 2009**, at **9:30 a.m.**, regarding Graham's request for a *Daubert* hearing.

### CONCLUSION

For the foregoing reasons, it is my recommendation that the district court deny Graham's motions to suppress his statement and the physical evidence seized from his person and the Honda **(Docket ## 5, 13)**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
November  23 , 2009

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[10]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                       *s/Marian W. Payson*
                                       MARIAN W. PAYSON
                                       United States Magistrate Judge

Dated: Rochester, New York
        November __23__, 2009

---

[10] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).